IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

QUARRA STONE COMPANY, LLC,

                               Plaintiff,                      OPINION AND ORDER

      v.

                                                     13-cv-790-slc

YALE UNIVERSITY,
THE WHITING-TURNER CONTRACTING COMPANY
and CAP STONE ROCK PRODUCTS, LLC,

                                Defendants.

---

This case presents a dispute arising from a multi-phase construction project involving the restoration of the Payne Whitney Gymnasium, a historic stone-clad building on the campus of Yale University in New Haven, Connecticut.  From approximately April to October 2013, plaintiff Quarra Stone Company, LLC supplied and fabricated the stone used on Phase I of the project, using sandstone quarried by defendant Cap Stone Rock Products, LLC.  Quarra thought it was a lock to win the bid for Phase II, but Yale contracted directly with Cap Stone to obtain the sandstone, then hired a different company to fabricate it.  Quarra now cries foul, claiming that Cap Stone's deal with Yale breaches Cap Stone's exclusivity agreement with Quarra, and that Yale tortiously interfered with this agreement and conspired to circumvent it with Cap Stone and their co-defendant, The Whiting-Turner Contracting Company.  Diversity jurisdiction exists under 28 U.S.C. § 1332.

Three front-end motions are before the court:  1) Yale's motion to dismiss for lack of personal jurisdiction, dkt. 11; 2) Yale and Whiting-Turner's motion to dismiss for lack of venue, dkt. 28; and 3) Quarra's motion for a preliminary injunction prohibiting Cap Stone from selling stone to Yale, Whiting-Turner, or any other party for use on the on the PWG project without Quarra's express, written approval, and prohibiting Yale and Whiting-Turner from purchasing such stone, dkt. 2.  As discussed in more detail below, I am denying all three motions.

Solely for the purpose of deciding these motions, I find the following facts to be material and undisputed, except where otherwise noted.

## FACTS

### I.  The Parties

Plaintiff Quarra Stone Company, LLC is a Wisconsin Corporation with its headquarters and principal place of business in Madison, Wisconsin.  Quarra is a supplier and fabricator of custom cut and carved stone for commercial and institutional construction projects.  Quarra maintains an extensive library of stone samples and literature in order to enable it to find appropriate replacement stone for historic buildings or matching stone for new constructions. James Durham is the president and CEO of Quarra.

Defendant Yale University is a non-stock Connecticut corporation with its principal place of business in New Haven, Connecticut.  Since 2000, Quarra has been the stone supplier and fabricator for at least 31 projects at Yale University, including Bass Library, Harkness Tower, Klein Biology and other buildings.  Yale has 1,049 alumni with a home address or residence in Wisconsin, and 999 of them receive the Yale alumni magazine.  Yale also mails fundraising solicitations to its Wisconsin alumni.  In fiscal year July 1, 2012 to June 30, 2013, Yale received $120,392.62 in contributions from 250 contributors in Wisconsin.

Defendant Whiting-Turner Contracting Company is a Maryland corporation with its principal place of business located in Baltimore, Maryland.  It has served as the construction manager for the Payne Whitney Gymnasium ("PWG")  renovation project since April 2011.

2

Defendant Cap Stone Rock Products LLC is an Ohio corporation organized with its principal place of business located in Marietta, Ohio.   W. Scott Elliott is the owner and president of Cap Stone.   From 2005 to present, Cap Stone has entered into several exclusivity agreements with Quarra for the provision of stone for various projects, including projects at Yale University.

## II.  The PWG Project

In November 2005, Yale retained Hillier Architecture ("Hillier") to perform a study and then recommend how to renovate the exterior of the PWG.  After receiving Hillier's draft study in 2006, Yale retained Hillier to complete the design for the renovation, including preparing bid documents for Phase I and Phase II of the project.

In 2006, Yale issued a request for bids to conduct work on PWG.  Quarra approached Cap Stone to suggest a joint effort to secure this work: Quarra would use its contacts, expertise and creative effort to qualify Cap Stone's stone and to secure for Cap Stone and Quarra the stone supply and fabrication work for the PWG project.  In exchange, Quarra asked Cap Stone to commit to working exclusively with Quarra on the project.  Cap Stone agreed and signed an exclusivity agreement with Quarra in December 2006, appointing Quarra as Cap Stone's exclusive distributor for this PWG project.  Complaint, dkt. 1, Exh. A.

The Agreement, in its entirety, states:

> This document confirms Quarra Stone LLC to be the exclusive distributor of CAPstone Rock Products sandstone(s) for the Yale Payne Whitney Gymnasium Addition building project in New Haven, CT, USA.  All inquiries originating from any other source conceivably relating to this project or to this stone will be directed to Quarra Stone, LLC.  Architects chosen for this project are

3

> Hillier Architects.  Scope is presently unknown.  Prices would be $17/CF for standard quarry blocks.
>
> CAPstone Rock Products has engaged Quarra Stone LLC as its exclusive distributor of sandstone in reference to the Yale Payne Whitney Gymnasium building project in New Haven, CT. USA. All inquiries related to this project or to this stone will be directed to Mr. James Durham, Quarra Stone Company, LLC, 4301 Robertson Road, Madison, Wisconsin, 53714, USA.  Tel. 608-246-8803, Fax. 608-246-8894.  jdurham@quarrastone.com

The Agreement was signed on behalf of Cap Stone by Scott Elliott on December 18, 2006.[1]

Quarra's customary business practice is to obtain exclusivity agreements from its stone suppliers on a project-by-project basis.  According to Quarra, it has more than a dozen exclusivity agreements with Cap Stone, several of them for other building projects at Yale.

Because of a lack of funding and concerns regarding the overall cost of Hillier's proposed renovation ($42.9 million), Yale cancelled the project in April 2009.  Accordingly, Quarra was never awarded a contract for the Hillier PWG renovation project.

Approximately two years later, in January 2011, Yale retained Wiss, Janney, Elstner Associates, Inc. ("WJE") to prepare new design documents for the exterior renovation of the

---

[1] Appearing below the signature block on the Agreement is this typewritten notation:

August 25, 2008

1) Includes specific color distribution requests as required to fulfill range requirements of restoration and new addition;

2) Pricing will be held @ $17/CF for first three (3) years of Yale University Payne Whitney Gymnasium project beginning in October 2008; pricing will increase 5% each year thereafter for the duration of the project

Neither Quarra nor Cap Stone has explained why, when or by whom this notation was prepared, or whether both sides agreed to these two terms.  In any case, it is unnecessary to answer these questions in order to decide the pending motions.

4

PWG.  Hillier is not involved in this project.  WJE's proposed project was smaller in scope than Hillier's, with an estimated cost of $19.7 million.

In April 2011, Yale retained the Whiting-Turner Contracting Company as construction manager for the WJE Renovation.  Danielle Gunther-Gawlak, a Yale employee, served as the project manager in charge of the project's scope, schedule and budget.  WJE completed its design for Phase I of the PWG Renovation in August 2012 and completed its design for Phase II in September 2013.

Quarra was awarded the stone supply and fabrication contract for Phase I of the PWG project, which included exterior renovation to the tower parapet and roof.  As was typical of Quarra's other projects at Yale, Quarra did not contract directly with Yale: Quarra contracted with the stone mason, who in turn contracted with the construction manager, Whiting-Turner, which contracted directly with Yale.

Quarra's work on Phase I of the project began in April 2013 and ended in mid-October 2013.  Quarra used stone provided by Cap Stone for this project.  Andrew Kerschner of Whiting-Turner visited Quarra's fabrication facility in Madison, Wisconsin in June and July 2013 to discuss the ongoing Phase I work and to plan for Phase II of the PWG project.  Another Whiting-Turner employee, Daniel Secone, visited Quarra twice in September 2013 to discuss both phases of the PWG project.

On August 29, 2013, before the work on Phase I was complete, Gunther-Gawlak of Yale sent an email to David Paige at davidsstone@suddenlink.net, a consultant acting as quarry manager for Cap Stone:  Gunther Gawlak identified herself as a Construction Project Manager with Yale and told Paige that "we are interested in finding a match to our Pennsylvania Age

Massillon sandstone at our gymnasium." Dkt. 43, exh. 1 at 1. Gunther-Gawlak stated how much stone would be needed and attached to her email a copy of specifications as well as photographs of a mock up that had been prepared by Quarra. In closing, she wrote: "I was hoping [you] could assist us and discuss the possibilities of supplying us in the near future." *Id.*

Paige responded the following day with an email expressing puzzlement. Paige indicated that as the manager of CapStone quarries, he had been "quarrying the stone for the Payne Whitney Gym for 5 months now for Quarra Stone," and that "I have the stone in ample quantity, but am presently engaged in providing it through Quarra Stone. I'll need more info to discuss this and why this is not a done deal with Quarra." *Id.*

In a reply email, Gunther-Gawlak told Paige that although Quarra was providing the stone for Phase I, the bidding process was just beginning for Phase II, and the mason contract had not yet been awarded. Gunther-Gawlak announced that Yale was "not interested in working with Quarra on Phase 2," and inquired whether Paige would provide stone to Yale or its awarded mason directly. *Id.* at 3. Paige did not respond to this second email.

Sometime in the Fall of 2013, Whiting Turner began soliciting bids for Phase II of the WJE Restoration project, which again involved renovations to PWG's exterior. Quarra and two other stone fabricators were listed as approved to perform the work. The bid specifications for Phase II included a mock up and photograph of a sample stone wall that had been constructed using stone from Cap Stone's quarry; these had previously been prepared and submitted by Quarra to Whiting Turner in January 2012.

On October 8, 2013, Kerschner (of Whiting Turner) visited Quarra along with two Yale employees (Gunther-Gawlak and Brian Eaton) to discuss specific logistics for Quarra's bid on

Phase II of the project.  What happened at this meeting is disputed, but for purpose of deciding the jurisdictional motions, I accept Quarra's version as true: Gunther-Gawlak and Kerschner were interested in knowing the name of the quarry that Quarra had used to supply sandstone for Phase I.  Kerschner explained that Yale and Whiting-Turner were thinking about taking a trip to see the quarries and asked where in Pennsylvania Quarra's source quarry was located. Durham, Quarra's president, responded the sandstone was from Ohio and that it said so in the stone specification.  Gunther-Gawlak asked "what is the big secret about the name of the quarry?"  Durham responded that there was no secret, that Quarra had taken Yale to the Cap Stone quarry in 2008 and at that time Quarra had provided Yale with a quarry report from the present architect that identified the quarry.  Gunther-Gawlak asked "is your quarry Cap Stone?" Durham confirmed that it was.  In addition, Gunther-Gawlak and Kerschner asked Durham how many blocks the Phase II project would require, how long the blocks would take to produce and what ratio Quarra generally uses to figure out the number of blocks required for a project. Kerschner left the October 8 meeting early, but Gunther-Gawlak and Eaton toured Quarra's fabrication shop and discussed the Phase II work and Quarra's capacities and capabilities.  Eaton took a photograph of the white board in Quarra's office that contained Durham's notes, including the names of people whom Quarra would be working with on the project and dates related to Quarra's schedule for the Phase II work.[2]

Around this same time, Gunther-Gawlak contacted Elliot at Cap Stone and asked him if Cap Stone would consider selling stone directly to Yale for Phase II of the PWG project.  Elliot

_____

[2] Synopsizing Durham third affidavit, dkt. 35 at 4; Gunther-Gawlak deposition, dkt. 38 at 75-79; Kerschner deposition, dkt. 41 at 19-20; Eaton deposition, dkt. 39 at 45-56.

told her that he was willing to consider it, but noted that Cap Stone had been supplying its stone to Yale for Phase I through Quarra. Gunther-Gawlak told Elliott that Yale was not interested in working with Quarra for Phase II. Elliott and Gunther-Gawlak agreed to meet on October 17, 2013 at Cap Stone's quarry to discuss Yale's offer in person. Elliott did not share this information with Quarra.

On or around October 10, 2013, Quarra submitted its bid (using Cap Stone's stone) to the three mason contractors that were bidding for the Phase II masonry contract. All three masons selected and incorporated Quarra's bid for stone supply and fabrication into their own bids. Quarra's price was $1.8 million. On October 11, 2013, Yale and Whiting-Turner told Quarra and the masons that the project was over budget and that Yale was considering other approaches.

Soon thereafter, Gunther-Gawlak texted Quarra to ask if it would reduce its bid to $1,000,000. In Durham's view, this request was not only economically impossible, but based on a faulty understanding of the amount of stone required for the Phase II work. Accordingly, on October 15, 2013, Durham e-mailed Gunther-Gawlak to request a meeting to clarify the bid and provide a "best and final" offer. Gunther-Gawlak agreed to meet on Friday, October 18, 2013.

On October 16, 2013, Whiting-Turner revealed to Quarra that Whiting-Turner and Yale were visiting Cap Stone the next day to view the quarry and to explore purchasing sandstone blocks directly from Cap Stone. Durham responded by directing a Quarra employee (Kim Kautzer) to send an e-mail to Gunther-Gawlak, Eaton, Kerschner and Secone. Kautzer wrote that she was attaching "the Exclusivity Agreement from the Quarry which was referred to in your

8

meeting last Tuesday." Dkt. 43, exh. 2 at 2.  Gunther-Gawlak forwarded this email to Cap Stone and asked, "Based on page 2 of the attached, can you please confirm to me that Capstone will sell direct to Yale for PWG phase 2?"  *Id.* at 1.  Elliott responded by email that "we do not recognize any exclusive arrangement with Quarra, and have told them so."  *Id.*

Shortly before his October 18 meeting with Gunther-Gawlak, Durham was told that Gunther-Gawlak and Eaton were unavailable and would not be attending.  Durham met with Kerschner and Secone of Whiting-Turner.  Kerschner reported that he, Secone and three Yale reps (Gunther-Gawlak, Eaton and Kristina Chmelar) had visited Cap Stone the previous day. Kerschner told Durham that Yale had reached an agreement in principle with the quarry to purchase 8000 cubic feet of sandstone blocks directly from Cap Stone.  Durham objected to any direct deal between Yale and Cap Stone based on Quarra and Cap Stone's December 2006 exclusivity agreement.  Kerschner responded that Cap Stone told Yale and Whiting-Turner that it had revoked that agreement.

OPINION

## I.  Personal Jurisdiction Over Yale

### A.  Legal Standard

On a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), the burden of proof rests on the party asserting jurisdiction–here, Quarra–to make a prima facie showing of personal jurisdiction over the moving party.  *Hyatt International Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002).  In deciding the motion, the court must take as true all well-pleaded facts alleged in the complaint and resolve "all disputes concerning relevant facts

presented in the record" in Quarra's favor. *Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*,

338 F.3d 773, 782 (7th Cir. 2003) (quoting *Nelson v. Park Industries, Inc.*, 717 F.2d 1120, 1123

(7th Cir. 1983)); *see also Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010) (quoting same).

A federal court has personal jurisdiction over a non-consenting, nonresident defendant

to the extent authorized by the law of the state in which that court sits, *Giotis v. Apollo of the*

*Ozarks, Inc.*, 800 F.2d 660, 664 (7th Cir. 1986), unless the federal statute at issue permits

nationwide service or the defendant is not subject to personal jurisdiction in any state in the

United States, *see* Fed. R. Civ. P. 4(k)(1) and *Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1201-02 (7th

Cir. 1997). Because the parties do not assert that either of these exceptions applies, the question

is whether Wisconsin law allows this court to exercise personal jurisdiction over Yale in this

lawsuit.

Wisconsin breaks this question into two parts. First, the court is to determine whether

Yale is within the reach of Wisconsin's long-arm statute, Wis. Stat. § 801.05. *Logan Prods., Inc.*

*v. Optibase, Inc.*, 103 F.3d 49, 52 (7th Cir. 1996); *Kopke v. A. Hartrodt S.R.L.*, 245 Wis. 2d 396,

408-09, 629 N.W.2d 662, 667-68 (Wis. 2001). This statute enumerates several different

grounds for personal jurisdiction and it is to be construed liberally in favor of exercising

jurisdiction. *Federated Rural Elec. Ins. Corp. v. Inland Power and Light Co.*, 18 F.3d 389, 391 (7th

Cir. 1994); *Lincoln v. Seawright*, 104 Wis. 2d 4, 9, 310 N.W.2d 596, 599 (Wis. 1981). Under

the local presence or status provision, § 801.05(1)(d), general jurisdiction may be established

in any action against a defendant, who when the action commenced, is engaged in "substantial

and not isolated activities within this state, whether such activities are wholly interstate,

intrastate, or otherwise." Other subsections of the long-arm statute provide for personal

10

jurisdiction in specific situations, such as in cases relating only to the commission of a tort or participation in a contract involving Wisconsin or its residents. *Johnson Worldwide Associates, Inc. v. Brunton Co.*, 12 F. Supp. 2d 901, 907 (E.D. Wis. 1998). Quarra contends that personal jurisdiction over the defendants is warranted under the general jurisdiction provision and three different provisions related to specific jurisdiction: local act or omission, § 801.05(3); local injury, foreign act, § 801.05(4)(a); and local services, goods or contracts § 801.05(5)(b).

If the statutory requirements of the long-arm statute are met, then the court must determine whether the exercise of jurisdiction over Yale in this lawsuit comports with due process requirements of the Fourteenth Amendment of the United States Constitution. *Id.* Like the long-arm statute, personal jurisdiction under the due process clause is divided into two categories, general and specific. *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Associates of Houston Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010). General jurisdiction means that the defendant "may be called into court there to answer for any alleged wrong, committed in any place." *uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 425-26 (7th Cir. 2010). It is a "demanding standard that requires the defendant to have such extensive contacts with the state that it can be treated as present in the state for essentially all purposes." *Id.*; *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984) (defendant must have "continuous and systematic contacts" with the state, even if action is unrelated to those contacts). *See also Daimler AG v. Bauman*, ___ U.S. ___, 2014 WL 113486, *9 (U.S. Jan. 14, 2014) ("we have declined to stretch general jurisdiction beyond limits traditionally recognized" and "it has come to occupy a less dominant place in the contemporary scheme").

11

With respect to specific jurisdiction, the crucial inquiry is whether a defendant's contacts with the state are such that it should reasonably anticipate being haled into that state's courts. *International Medical Group, Inc. v. American Arbitration Association, Inc.*, 312 F.3d 833, 846 (7th Cir. 2002) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).

The state and federal requirements are addressed separately below. Because I am persuaded that this court has specific jurisdiction over Yale under either § 801.05(3) or § 801.05(4) and that the constitutional standard is met, it is unnecessary to address Quarra's arguments with respect to general jurisdiction or § 801.05(5) of the long-arm statute.

## B. Long-Arm Statute

### 1. Local act or omission

Wis. Stat. § 801.05(3) allows a court to exercise personal jurisdiction over a defendant in "any action claiming injury to person or property within or without this state arising out of an act or omission within this state by the defendant." The analysis of this provision relies in large part on the type of claim at issue. Here, Quarra alleges that Yale conspired with Whiting-Turner to intentionally interfere with the exclusivity agreement between Quarra and Cap Stone.

Under Wisconsin law, there are four elements to a claim of intentional interference with contract: (1) a contractual relationship; (2) the defendant interfered with that relationship; (3) the defendant acted intentionally; and (4) the interference damaged the plaintiff. Under Wisconsin law, a civil conspiracy is a "combination of two or more persons by some concerted action to accomplish some unlawful purpose" which results in an injury to plaintiff. *Anderson v. Regents of University of California*, 203 Wis. 2d 469, 554 N.W.2d 509, 518 (Ct. App. 1996);

WI JI-CIVIL 2800.  Therefore, the relevant inquiry is whether Yale's contact with Quarra in the later part of 2013 was part of the wrongful conduct that forms the basis of Quarra's claims.  *See Felland v. Clifton*, 682 F.3d 665, 679 (7th Cir. 2012).

Plaintiff suggests that the decision in *Felland* is instructive here.  While Felland was vacationing in Arizona, Felland visited an under-construction condominium project in Mexico and ended up purchasing a condominium from a developer based in part on alleged misrepresentations made by defendant during a sales pitch in Mexico.  The court held that although the initial fraud occurred in Mexico, defendant's subsequent communications to Wisconsin assuring plaintiff that the project was adequately financed and on schedule were part of a comprehensive and ongoing scheme to perpetuate the initial fraud.  *Felland*, 682 F.3d at 675.

Yale contends that a discrete instance of alleged contract interference is markedly different from the allegation of ongoing misrepresentation in *Felland*.  This contention is accurate and irrelevant in equal measure.  Here, even though defendants' alleged contract interference and related conspiracy may have had their locus elsewhere, Yale's interactions with Quarra in Wisconsin were, if Quarra's allegations are accepted as true, overt acts in furtherance of a three-state scheme that culminated, as Yale intended, in the breach of the Quarra-Cap Stone exclusivity agreement in Ohio.

According to Durham, when Gunther-Gawlak's visited Quarra in Wisconsin in October 2013, she asked Durham about the stone that Quarra had used during Phase I, how many blocks the Phase II project would require, how long the blocks would take to produce and what ratio Quarra generally uses to figure out the number of blocks required for a project.  Perhaps

13

Gunther-Gawlak merely was curious about Quarra's services, but it is reasonable to infer that Yale did not need this information and would not have asked for it but for its unspoken plan to ditch Quarra buy stone directly from Cap Stone.   The reasonableness of this inference is bolstered by the fact that prior to her meeting with Durham, Gunther-Gawlak already had reached out to Cap Stone to suggest that it sell stone directly to Yale.

Although it is not entirely clear when Yale learned about the exclusivity agreement between Quarra and Cap Stone, the evidence submitted so far suggests that Gunther-Gawlak learned of it from Paige at Cap Stone in August 2013.   Paige was reluctant to commit to Gunther-Gawlak because Cap Stone was "presently engaged in providing [the stone] through Quarra Stone" and he needed "more info to discuss this and why this is not a done deal with Quarra."   In addition, Quarra also has produced an email in which reference was made to Durham and Gunther-Gawlak referencing the agreement during their October 8, 2013 meeting. Three days later, Yale informed Quarra that its bid was too high and asked Quarra to cut it by 44%.   Within a week, Yale had contracted with directly Cap Stone, cutting Quarra out of the deal.

Accepting Quarra's alleged facts as true and drawing all inferences in favor of Quarra, I find that Yale's actions in Wisconsin constituted a key component of Quarra's claim for tortious interference of contract.   Therefore Yale's actions in Wisconsin meet the requirements of § 801.05(3).   *See Felland*, 682 F.3d at 679.

## 2.  Local injury, foreign act

Even if the link between Yale's actions in Wisconsin were too tenuous to support personal jurisdiction under § 801.05(3), Quarra also has shown that it can satisfy the

requirements of § 801.05(4)(a).  This provision authorizes personal jurisdiction in any action claiming injury to a person within Wisconsin arising out of "an act or omission outside this state by the defendant, provided in addition that at the time of the injury . . . [s]olicitation or service activities were carried on within this state by or on behalf of the defendant."  Yale has focused its objection to this provision on the local injury requirement and has not replied to Quarra's contention that the communications directed to Wisconsin by Yale and its agent, Whiting-Turner, about the Phase II bidding process, schedule, payment system and reduction in Quarra's bid constituted "solicitation or service activities" under the statute.  As a result, I will assume that Yale agrees with Quarra that the solicitation requirement is met.[3]

Yale contends that the situs of the injury in this case is Ohio because that is where the alleged interference occurred.  Yale also cites cases from other jurisdictions which have held that where the damage is economic, the situs of the injury is where the critical events associated with the action took place and not merely where any financial loss or damages occurred.  *See Allred v. Moore & Peterson*, 117 F.3d 278, 283 (5th Cir. 1997) (rejecting plaintiff's argument that although none of elements of malicious prosecution occurred in Mississippi, he suffered economic, reputational and emotional injuries there); *Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137, 1142 (7th Cir. 1975) (finding personal jurisdiction where plaintiff alleged that German manufacturer induced patent infringement by arranging for extensive distribution of its product in Illinois); *Eastboro Foundation Charitable Trust v. Penzer*, 2013 WL 3001408 (S.D.N.Y. 2013) (no personal jurisdiction in New York where events underlying failed real estate

---

[3] Although not argued by Quarra, I note that Quarra has adduced evidence that Yale has 1,049 alumni in Wisconsin from whom it makes fundraising solicitations by mail.  In fiscal year July 1, 2012 to June 30, 2013, Yale received $120,392.62 in contributions from 250 contributors in Wisconsin.

transaction occurred entirely in New Jersey and not in New York where plaintiff felt financial loss); *Robb v. Robb*, 620 F. Supp. 2d 282 (D. Conn. 2009) (finding no personal jurisdiction in Connecticut where alleged sexual abuse occurred in New York and plaintiff only later realized that abuse occurred while she was living in Connecticut).  The instant case is distinguishable on its facts:  not only has Quarra alleged that it suffered financial injury and loss in Wisconsin, but those alleged injuries arose out of the cancellation of an exclusivity agreement entered into by a Wisconsin resident for the fabrication of stone at a Wisconsin facility.  Further, as explained in detail above, Ohio may be the state in which Yale's alleged torts were completed, but material events and acts associated with the alleged torts interference occurred in Wisconsin.  As a result, I conclude that § 801.05(4)(a) authorizes this court to exercise personal jurisdiction over Yale in this lawsuit.

### C.  Due Process Considerations

There are three essential requirements related to specific jurisdiction under the due process clause: (1) the defendant must have purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state, *Burger King*, 471 U.S. at 472; (2) the alleged injury must have arisen from or relate to the defendant's forum-related activities, *id.*; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice, *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Felland*, 682 F.3d at 673.  Wisconsin's long-arm statute has been interpreted to confer jurisdiction "to the fullest extent allowed under the due process clause." *Daniel J. Hartwig Associates, Inc. v. Kanner*, 913 F.2d 1213, 1217 (7th Cir. 1990); *see also Felland*, 682 F.3d at 678 ("[C]onstitutional and statutory questions tend to merge; compliance with the Wisconsin

long-arm statute creates a presumption that constitutional due process is satisfied."); *Kopke*, 629 N.W.2d at 671 ("Compliance with the [long-arm] statute presumes that due process is met, subject to the objecting defendant's opportunity to rebut."). For many of the same reasons explained above, I find that Yale has not rebutted that presumption in this case.

### 1.  Conduct purposefully directed at forum state

As with the long-arm statute, this inquiry depends in large part on the type of claim at issue. *Felland*, 682 F.3d at 674. When a plaintiff alleges an intentional tort, then personal jurisdiction generally turns on "whether the conduct underlying the claim[ ] was purposely directed at the forum state." *Tamburo*, 601 F.3d at 702. Interpreting the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984), the court of appeals has identified three requirements for a plaintiff to show that conduct was purposefully directed at the forum state: "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Tamburo*, 601 F.3d at 703; *see also Felland*, 682 F.3d at 674-75 (citing same).

The first and third elements are easily met in this case. Quarra alleges that Yale intentionally interfered with the Quarra-Cap Stone exclusivity agreement (which is tortious conduct under Wisconsin law), and that Yale knew that Quarra would feel the effects of Yale's actions at Quarra's place of business in Madison. The dispute is whether Yale's conduct was "expressly aimed" at Wisconsin. Yale asserts that the target of its alleged conduct was located in Ohio and that Cap Stone allegedly breached the exclusivity agreement in Ohio, where it signed a new agreement with Yale. However, as discussed above, the alleged target of Yale's

conduct was an exclusivity agreement executed in part by a Wisconsin company that would fabricate stone at its Madison facility.  Further, Yale's communications with Quarra in Madison constitute acts of interference that occurred in Wisconsin.

### 2.   The injury arises out of Yale's contacts

In the absence of Supreme Court guidance on this requirement, federal circuit courts disagree whether a defendant's contacts must be the factual cause of plaintiff's injury, the factual and proximate cause, or something in between.  *Tamburo*, 601 F.3d at 708–09 (citing cases); *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1078 (10th Cir. 2008) (outlining the conflict).  The Court of Appeals for the Seventh Circuit has suggested that a mere "but for" causal relationship is insufficient, *GCIU–Employer Retirement Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1025 (7th Cir. 2009) (citing *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 322 (3d Cir. 2007)), but it has declined to resolve the question definitively, *Felland*, 682 F.3d at 676-77; *Tamburo*, 601 F.3d at 709.  In any event, Quarra's allegations are sufficient to establish even the strictest application of the standard because Quarra's alleged injuries—loss of its exclusive arrangement with Cap Stone and loss of the Yale Phase II bid—arise from and are related to Yale's contacts with Wisconsin for the reasons discussed above.

### 3.   Fair play and substantial justice

"The final inquiry in the specific-jurisdiction analysis is whether the exercise of personal jurisdiction over an out-of-state defendant would offend traditional notions of fair play and substantial justice."  *Felland*, 682 F.3d at 677 (citing *International Shoe*, 326 U.S. at 316).  Factors relevant to this determination include the burden on defendant, Wisconsin's interest in

adjudicating the dispute, plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the shared state interest in "furthering fundamental substantive social policies." *Id.* (quoting *Burger King*, 471 U.S. at 477).

"[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Felland*, 682 F.3d at 677.  Yale first contends that "sheer geography makes it unduly burdensome."  Although Yale faces some burden in being forced to defend an action in another state, out-of-state defendants always face such a burden.  There is no suggestion that Yale's hardship would be any greater than that routinely tolerated by courts exercising specific jurisdiction against nonresidents.  *Id.*  This is all the more true when one weighs the burden of traveling from Connecticut to Wisconsin against the burden of traveling to Ohio.

Yale also argues that Ohio has a much stronger interest in adjudicating this action because the other major player (Cap Stone), the actual stone needed to complete the project are located in Ohio, which also is where the alleged tortious conduct occurred.  This argument rehashes Yale's previous arguments related to the location of the alleged tortious conduct and resulting injury, and it fails for the reasons previously stated.  Further, Wisconsin has a strong interest in providing a forum for its residents to seek redress for wrongs inflicted by out-of-state actors and resulting injuries suffered within the state.  *Felland*, 682 F.3d at 677.  As a result, I do not find either of Yale's reasons to be compelling enough to render jurisdiction unreasonable in Wisconsin.

In sum, this court finds that it has jurisdiction over defendant Yale in this lawsuit.

## II. Venue

### A. Legal Standard

Defendants Yale and Whiting-Turner have moved to dismiss the claims against them for lack of venue, pursuant to F.R. Civ. P. 12(b)(3).  As with dismissal motions claiming lack of personal jurisdiction, the court must resolve all factual disputes and draw all reasonable inferences in Quarra's favor, with Quarra then bearing the burden of establishing that venue is proper.  *Saylor v. Dyniewski*, 836 F.2d 341, 342 (7th Cir. 1988); *Interlease Aviation Investors v. Vanguard Airlines, Inc.*, 262 F. Supp. 2d 898, 913 (N.D. Ill. 2003).

Quarra asserts that venue is proper under 28 U.S.C. § 1391(a)(2), which provides that a federal civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  Determining whether a "substantial part of the events" occurred in this district requires an assessment of the overall nature of Quarra's tort claims and the nature of the events that allegedly took place in Wisconsin.  *Daniel v. American Board of Emergency Medicine*, 428 F.3d 408, 432-33 (2d Cir. 2005) (stating that when events or omissions within district "bear a close nexus to the claims, they are properly deemed 'significant' and, thus, substantial, but when a close nexus is lacking, so too is the substantiality necessary to support venue"); *Estate of Moore v. Dixon*, 460 F. Supp. 2d 931, 936 (E.D. Wis. 2006).  Focusing on the defendant's acts and omissions, "the test is not whether a majority of the activities pertaining to the action were performed in a particular district, but rather, whether a substantial portion of the activities giving rise to the action occurred in the district."  *Dixon*, 460 F. Supp. 2d at 936 (citing *TruServ v. Neff*, 6 F. Supp. 2d 790 (N.D. Ill. 1998).  A substantial part of the relevant acts or omissions can occur in more than one place, *id.*, which means that

venue may be proper in more than one district. *PKWare, Inc. v. Meade*, 79 F. Supp. 2d 1007, 1016 (E.D. Wis. 2000).

Courts do not look to a single triggering event prompting the action, but to the entire sequence of events underlying the claim. *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 (1st Cir. 2001); *Dixon*, 460 F. Supp. 2d at 936. Often it is enough to establish that events which "were part of the historical predicate for the instant suit" took place in the district. *Uffner*, 244 F.3d at 42 (venue was proper in district where property was damaged even though defendant insurer did not cause damage). *See also Master Tech Products, Inc. v. Smith*, 181 F. Supp. 2d 910, 914 (N.D. Ill. 2002) (citing same). In addition, the requirements "'may be satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action.'" *Interlease*, 262 F. Supp. 2d at 913 (quoting *Fogelson v. Iatrides*, 2000 WL 631293, at *3 (N.D. Ill. May 12, 2000)).

## B.  Analysis

Quarra initially contends that Yale waived its right to file a Rule 12(b)(3) motion because it did not join its motion with its Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. Quarra is correct that Rule 12(g)(2) provides that "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." The purpose behind the rule is to prevent a second bite at the apple and piecemeal litigation. *Doe v. White*, 2010 WL 323510, *2 (C.D. Ill. Jan. 20, 2010). Yale responds that its venue motion does not violate these

21

principals because it has maintained all along that the allegedly tortious conduct in this case–the signing of the new contract between Yale and Cap Stone–occurred in Ohio and not Wisconsin.

I agree with Yale that it has raised the same arguments in challenging venue as it did in challenging personal jurisdiction.  Not surprisingly, then, Yale's motion challenging venue fails for the same reasons as the motion challenging personal jurisdiction. Therefore, regardless whether Yale should have joined its motions under Rule 12(g)(2), the outcome is the same.  As discussed at length above, many of the alleged activities that led up to Yale and Cap Stone freezing out Quarra, as well as Quarra's resulting injury, occurred in Wisconsin.[4]  As a result, I am denying Yale's and Whiting-Turner's motion to dismiss this action for improper venue.

## III.  Quarra's Motion for Preliminary Injunction

A preliminary injunction is an extraordinary remedy that is "never to be indulged in except in a case clearly demanding it."  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the USA, Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) (internal citations and quotations omitted). The party seeking a preliminary injunction must clearly demonstrate that it is entitled to the relief it seeks. *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005).

To obtain a preliminary injunction, the moving party must demonstrate the following threshold requirements:  (1) it has no adequate remedy at law; (2) it will suffer irreparable harm if a preliminary injunction is denied; and (3) there is some likelihood of success on the merits of the claim.  *Girl Scouts*, 549 F.3d at 1086 (citing *Ty, Inc. v. The Jones Group, Inc.*, 237 F.3d 891,

---

[4] Although the court's discussion of Yale's jurisdictional challenge focused on Yale's conduct, I note that Whiting-Turner's representatives were at the October 8, 2013 meeting and actually had more contacts with Quarra than Yale did regarding the source of Quarra's stone and Quarra's plans for Phase II of the PWG project.

895 (7th Cir. 2001)).  If the moving party fails to establish any one of these threshold requirements, then the court must deny the injunction.  *Id*.  If the moving party meets this threshold burden, then the court weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest.  *See Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011).

Quarra has not met its burden with respect to the threshold elements.  First, it seems unlikely that Quarra will succeed on the merits.  All of Quarra's claims depend upon Quarra establishing that the 2006 Exclusivity Agreement still is in effect and that it governs the parties' relationship with respect to Phase II of the WJE Renovation Project.  As Quarra admits, however, the express terms of the Agreement provide that the architect on the project was Hillier.  It is undisputed that Yale cancelled the Hillier project in 2009, before Quarra ever was awarded a contract.  Quarra's contention that the sentence identifying Hillier as the architect on the project was merely descriptive and not prescriptive is difficult to reconcile with the plain language of the contract, which is controlling notwithstanding a party's different construction. *See Woodward Commc'ns, Inc. v. Schockley Commc'ns Corp.*, 2001 WI App 30, ¶ 9, 240 Wis.2d 492, 498, 622 N.W.2d 756, 759-760.  Moreover, even if the contract arguably is ambiguous, the lion's share of extrinsic evidence adduced so far favors Cap Stone.

In any event, it is unnecessary at this juncture to delve too deeply into the merits.  Even if the court assumes, *arguendo*, that Quarra has *some* likelihood of succeeding on its claim, then the typical remedy for a breach of contract is monetary damages.  *Walgreen Co. v. Sara Creek Prop. Co., B.V.*, 966 F.2d 273, 274-75 (7th Cir. 1992).  The exceptional remedies of specific

23

performance or an injunction are warranted only when monetary damages are inadequate, either because they are difficult to quantify or the defendant is insolvent. *Miller v. LeSea Broad., Inc.*, 87 F.3d 224, 230 (7th Cir. 1996). Quarra has not argued that Cap Stone lacks the financial ability to pay damages; instead, Quarra contends that it lacks an adequate remedy at law because the damages it will suffer are not easily quantifiable, if they can be quantified at all.

Quanta's contention is fanciful. As an initial matter, Quarra is incorrect when it suggests that the breach of an exclusivity clause, in and of itself, "almost always" warrants the award of injunctive relief. *See* Quarra's Brief in Support of Preliminary Injunction, dkt. 3, at 5-6. To the contrary, in each of cases cited in Quarra's brief, the court examined the facts before it and determined that the damages alleged by the party seeking an injunction were *in fact* difficult if not impossible to calculate and that the balance of harms tipped in favor of granting the injunction. *See, e.g., Walgreen Co.*, 966 F.2d at 277 (affirming district court's permanent injunction enforcing exclusivity provision in shopping center lease where damages calculation would have required Walgreens to project ten years of revenues and costs, then project impact on those figures from Phar–Mor's competition, an exercise "fraught with uncertainty"); *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 38-39 (2nd Cir. 1995) (publisher that showed substantial likelihood of success on the merits of its claim that licensor of Power Rangers characters had breached agreement granting publisher right of first refusal to publish Power Rangers books was entitled to preliminary injunction requiring licensor to license publisher to publish one Power Rangers book; although publisher would not suffer any loss of existing sales or go out of business if it could not publish book, opportunity to publish a Power Rangers book was "wholly unique" and likely to cause publisher's overall business to expand, and

value to company was "beyond ready calculation"); *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, n. 3 and 6 (8th Cir. 1984) (ordering defendant to turn over its hybrid seed corn to plaintiff for distribution for 1983 growing season where defendant had not controverted plaintiff's evidence that it was likely to succeed on merits in arbitration of dispute over contract term, plaintiff had no alternative source from which plaintiff could obtain food corn and defendant had no means to effectively distribute and sell its corn for 1983 growing season without plaintiff). Having reviewed these cases and Quarra's evidence and arguments in support of its motion, I am not persuaded that the factors that warranted extraordinary equitable relief in the cited cases are present in the instant case, notwithstanding the fact that this case involves an exclusivity agreement.

Notably, there is no evidence in the record suggesting that the loss of the right to distribute Cap Stone's stone for the PWG project is not quantifiable. Quarra does not suggest that it will go out of business or that it will have no alternative supply of stone for other projects if it does not obtain an injunction in this lawsuit. If Quanta suffered damages in this case, then they undoubtedly are quantifiable based on the profit that Quarra expected to reap if it had won the bid for Phase II using Cap Stone's stone.[5] Although Quarra also points out that it expended

---

[5] Based on just the current record, there is room to question whether Quarra will be able to prove that it actually would have won the Phase II bid in the absence of Yale's direct solicitation of Cap Stone. There is evidence in the record suggesting that Yale was unhappy with Quarra's work on Phase I and on a project involving a different building, that Yale was looking for a different stone fabricator for Phase II, and that Yale viewed Quarra's bid for Phase II to be too high. Quarra has not pointed to any evidence establishing that Yale is so keen upon continuing the PWG renovation with stone from Cap Stone's quarry that Yale will do whatever it takes to make this happen, including obtaining Cap Stone's stone through Quarra, notwithstanding Yale's concerns about Quarra's performance and pricing.

25

a great deal of time, effort and money to get Cap Stone's sandstone "qualified" to be installed at the Payne Whitney Gymnasium, these damages, too, ought not be difficult to quantify.

Quarra's primary argument in support of a preliminary injunction is that its entire "business model" will be irreparably harmed if Cap Stone is permitted to contract directly with Yale to provide quarried sandstone for the PWG project.  If an injunction is not granted, says Quarra, then Quarra "very likely" will face other attempts—by Cap Stone and other stone suppliers—to break Quarra's exclusive distributorship model, "which relies on the exclusive right to distribute the stone it is attempting to qualify for a project."  Quarra argues:

> If Quarra's goodwill is diminished and the quarries and contractors it works with learn that they can rely on Quarra to do the heavy lifting and then abandon Quarra at the finish line without paying for Quarra's services, Quarra will lose future profits as it gets cut out of current and future projects.

Br. in Reply, dkt. 58, at 18.

This argument is illogical and unpersuasive.  It sets up a flimsy straw man: if Cap Stone is allowed to breach *this* contract, then the breach will trigger a chain reaction that will incinerate *every* Quarra contract like fissile isotopes in an A-bomb.  But Cap Stone does not contest the facial validity of the 2006 Exclusivity Agreement upon which Quarra's claims rest; Cap Stone does not contest Quarra's use of such agreements in general; Cap Stone merely contests the applicability of this particular agreement to the current WJE renovation project on the PWG. A ruling by this court declining to order Cap Stone to use Quarra as its exclusive distributor for the WJE Renovation would have no impact on or application to the terms and provisions of any other exclusivity agreement that Quarra has with Cap Stone or with any other stone supplier on any other project.

26

On the other hand, if this court finds that Cap Stone *did* breach its agreement with Quarra, then Cap Stone will be liable for Quarra's provable damages, including Quarra's net losses incurred qualifying Cap Stone's stone.  Regardless of the outcome of this particular lawsuit, the risk of paying damages for a breach remains in place for all the other agreements Quarra has with Cap Stone and with all the other quarries.  To the same effect, regardless of the outcome here, Quarra remains free in future projects to bargain for exclusivity agreements from a stone supplier before attempting to qualify a supplier's stone for a particular project.  In short, the fundamentals of contract law will survive this lawsuit.

In short, Quarra's concern that it will get "cut out" of future projects without being paid for work already done is unfounded and provides no support for preliminary injunctive relief, particularly where Quarra has methods and means to protect itself from such harm. *See Singer Co. v. P.R. Mallory & Co., Inc.*, 671 F.2d 232, 235 (7th Cir. 1982) (speculative injury does not constitute an irreparable injury justifying injunctive relief).

Also, Quarra argues that a failure by this court to order Cap Stone to use Quarra as its exclusive distributor on the PWG project will cause unquantifiable damage to Quarra's reputation and goodwill among the relatively small and tight–knit group of contractors who do work for Yale and on other major architectural projects in New England.  It is unclear, however, why this is so.  Quarra does not suggest that its ability to supply stone and complete its other projects pending at Yale or elsewhere will be jeopardized if this court fails to order specific performance of the single, project-specific agreement at issue in this case.[6]

---

[6]  If Quarra's real fear is that the instant contretemps with Cap Stone and Yale could be a portent that Quarra's days as a middleman in the industry are numbered, that would be Adam Smith's invisible hand at work.  I agree with Quarra that this would constitute a big problem for its current business model, but disquieting auguries cannot be dispelled with injunctions.

Finally, Quarra argues that an injunction is necessary to prevent it from losing its "work product and intellectual property," specifically, its rights to a "highly innovative method for delivering stone" using pre-blended packages that it claims to have developed.  Br. in Support, dkt. 3, at 8.  This argument is another non-starter.  First, Cap Stone argues that *it*, not Quarra, came up with the so-called "highly-innovative" method of stone delivery for which Quarra now takes credit, placing Quarra's claim in sharp dispute.  Second, there is no evidence that Quarra has taken any steps to copyright or trademark its "innovation," or otherwise sought to prevent its unlicensed use; certainly, Quarra has not asserted any claim for misappropriation of intellectual property here.  Finally, there is no evidence to suggest that Cap Stone or Yale have "misappropriated" the delivery method, if in fact there could be such a claim.  Although Quarra points out that Yale has included in the Phase II bid specs Quarra's mock-up of a stone wall, neither Yale's bid specifications nor the mock-up says anything about any method of packaging or delivering stone.  As far as the mock-up itself goes, Quarra freely provided that information to Yale as part of a public bidding process, thereby waiving any claim of misappropriation.

In sum, there is no support in the record for Quarra's claim that it cannot be made whole by the typical award of money damages if Quarra were to prevail on the merits.  Therefore, preliminary injunctive relief is not appropriate.

Although this conclusion obviates any need for the court to weigh the competing harms that will result if a preliminary injunction is or is not granted, for the sake of completeness I find that the balance weighs against granting a preliminary injunction.  As noted above, if this court were to enter a preliminary injunction, it is unclear whether Yale would continue with its plans to use Cap Stone's stone for Phase II.  It is possible that Yale would rather find a different source for its stone.  Thus, there is a very real potential that *both* Quarra *and* Cap Stone would be off

28

the project, with Yale scouting for a new stone source, and the project delayed in the meantime.

Alternatively, Yale might simply put the entire project on hold until this lawsuit is resolved on

the merits, which in turn would cause potential hardships on not only Cap Stone but to every

intertwined subcontractor waiting to begin work.   These potential harms far outweigh any

potential harm to Quarra, particularly when Quarra's chances of prevailing on the merits appear,

at this juncture, to be slim.  *See Planned Parenthood*, 699 F.3d at 972 (when weighing competing

harms, court must utilize sliding-scale analysis, meaning that greater the likelihood of success on

the merits, less heavily the balance of harms must tip in moving party's favor, and vice versa).


ORDER

IT IS ORDERED that:

(1)   Yale's motion to dismiss the complaint for lack of personal
      jurisdiction, dkt. 11,  is DENIED;

(2)   Yale and Whiting-Turner's motion to dismiss for lack of venue,
      dkt. 28, is DENIED; and

(3)   Quarra's motion for a preliminary injunction, dkt. 2, is DENIED.


Entered this day of 29th January, 2014.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge