IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

QUARRA STONE COMPANY, LLC,

                            Plaintiff,                        OPINION AND ORDER

      v.

                                                    13-cv-790-slc

YALE UNIVERSITY,
THE WHITING-TURNER CONTRACTING COMPANY
and CAP STONE ROCK PRODUCTS, LLC,

                            Defendants.

---

This lawsuit arises out of a contract dispute between a stone fabricator (plaintiff Quarra) and a quarry (defendant Cap Stone) whence the fabricator has obtained stone for use on historic buildings. Each accuses the other of contractual backstabbing regarding a gym renovation project at Yale University. Quarra claims that Cap Stone breached a 2006 Exclusivity Agreement that required Cap Stone to use Quarra to finish and provide quarry stone for the Yale project. Cap Stone counterclaims that this Exclusivity Agreement clearly has ended and Quarra knows it, so that Quarra's invocation of the Exclusivity Agreement as the basis for this lawsuit amounts to abuse of process and tortious interference with the contract between Cap Stone and Yale.

Before the court is Quarra's motion to dismiss Cap Stone's tortious interference and abuse of process claims pursuant to Fed. R. Civ. P. 12(b)(6). *See* dkt. 73. Because Cap Stone's allegations do not state claims under Wisconsin law for tortious interference with contract or abuse of process, I am granting Quarra's motion.

For the purpose of deciding the instant motion, the court assumes, as it must, that all of the allegations in Cap Stone's challenged counterclaims are true. These are Cap Stone's allegations:

## ALLEGATIONS OF THE CHALLENGED COUNTERCLAIMS

Cap Stone holds a lease to quarry stone from a quarry situated in Knox County, Ohio, from which it produces desirable, high-grade Massillon sandstone. Quarra is a supplier and fabricator of custom cut and carved stone for commercial and institutional construction projects. Cap Stone and Quarra have worked together on various projects for several years, with Quarra fabricating Cap Stone's rough blocks into architectural stone. Quarra is not the only fabricator with whom Cap Stone has worked on similar projects.

In 2006, Quarra submitted a proposal for work on the Payne Whitney Gymnasium (PWG) Project on the Yale University Campus. The architect chosen for the project was Hillier. The project had a budget of $42 million and was broad in scope.

On December 18, 2006, Scott Elliott of Cap Stone signed an agreement with Quarra in December 2006, appointing Quarra as its exclusive distributor of its quarry stone for the "Yale Payne Whitney Gymnasium Addition." The Agreement reads as follows:

> This document confirms Quarra Stone LLC to be the exclusive distributor of CAPstone Rock Products sandstone(s) for the Yale Payne Whitney Gymnasium Addition building project in New Haven, CT, USA. All inquiries originating from any other source conceivably relating to this project or to this stone will be directed to Quarra Stone, LLC. Architects chosen for this project are Hillier Architects. Scope is presently unknown. Prices would be $17/CF for standard quarry blocks.

> CAPstone Rock Products has engaged Quarra Stone LLC as its exclusive distributor of sandstone in reference to the Yale Payne Whitney Gymnasium building project in New Haven, CT. USA. All inquiries related to this project or to this stone will be directed to Mr. James Durham, Quarra Stone Company, LLC, 4301 Robertson Road, Madison, Wisconsin, 53714, USA. Tel. 608-246-8803, Fax. 608-246-8894. jdurham@quarrastone.com

> *See* dkt. 68, exh. A.

2

In August 2008, Quarra sought to renew the Exclusivity Agreement and add a second project (The Renovation Project) to the original agreement. Quarra sent a modified agreement to Cap Stone, but Cap Stone never signed it. Later that month, Cap Stone sent its own proposed Exclusivity Agreement to Quarra regarding the Yale projects. Unlike the original Exclusivity Agreement into which Cap Stone had entered with Quarra, Cap Stone's proposed new agreement was bilateral. Quarra did not sign the agreement proposed by Cap Stone.

On November 24, 2008, Elliott of Cap Stone sent the following email to Quarra:

> Gentlemen, In September of this year, you asked us to renew the expired exclusivity agreement between Cap stone and Quarra regarding the Payne Whitney Gymnasium at Yale. We [Cap Stone] sent you [Quarra] a renewal agreement for your consideration, but to date we have not received any input from you. Absent any further discussions between us, we will consider the matter closed, without renewal.

The parties had no further communication about renewing the Exclusivity Agreement.

On February 9, 2009, the original proposed PWG project with Hillier was cancelled.

In January 2011, Yale retained a different architecture firm, Wiss, Janney, Elstner Associates, Inc. (WJE), to prepare new design documents for the exterior renovation of the PWG. WJE proposed—and Yale accepted—a smaller project than Hillier had proposed. This time, the smaller PWG project moved forward. It was bid in phases and was managed by Yale's construction manager, the Whiting-Turner Construction Corporation. In early 2013, Quarra won the stone supply and fabrication contract for Phase I of the project, using Cap Stone's stone. However, no exclusivity agreement was executed by Cap Stone for this project.

By August 2013, Yale had become dissatisfied with Quarra's performance as a stone fabricator on both the WJE Phase I and on another construction project involving Yale's Dwight

Hall.  Yale began exploring the possibility of purchasing stone directly from the quarry and using a fabricator other than Quarra for the second phase of the WJE PWG renovation.  In August 2013, Yale contacted Cap Stone directly, seeking information about the original stone used when the PWG was first constructed in 1931.

In the fall of 2013, Quarra learned that Yale was purchasing stone directly from Cap Stone.  Quarra also learned that Yale planned to visit Cap Stone's quarry.  Quarra sent messages and materials to Yale, Whiting-Turner and Cap Stone, in which it represented that Yale's direct purchase of stone from Cap Stone was prohibited under the 2006 Exclusivity Agreement.  This was an untrue statement that Quarra knew to be false.  Later, after learning that Yale had in fact hired Cap Stone independently, Quarra hired counsel to send a letter threatening to sue Cap Stone for breaching the 2006 Exclusivity Agreement.

In Count IV of its counterclaims, Cap Stone asserts a claim of intentional interference with a contract.  Cap Stone alleges that, "[b]y only providing the expired agreement and omitting the other facts that occurred relevant to the agreement," Quarra acted in bad faith and interfered in the contract between Cap Stone and Yale.  *Id*. at ¶40.  Cap Stone asserts that after Quarra's alleged interference, Cap Stone was "required to modify its agreement with Yale to its financial detriment," *id*. at ¶41, and that it has suffered damages and incurred significant costs as a result of this contractual modification.  *Id.*, at ¶42.

In Count VI, Cap Stone asserts a claim for abuse of process.  According to Cap Stone, Quarra has misused the legal process by filing this suit either to "bankrupt" Cap Stone or to force Cap Stone into negotiations, all the while knowing that the Exclusivity Agreement upon which this action rests is no longer valid or enforceable.  *Id*. at ¶¶ 47-51.

4

# OPINION

## I. Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint and not the merits of the suit. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In ruling on such a motion, the court accepts as true all of the well-pleaded facts alleged by the plaintiff and all reasonable inferences that can be drawn therefrom. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *see also Tamayo v. Blagojevich*, 526 F.3d 1074, 1082–83 (7th Cir. 2008). To survive a 12(b)(6) motion to dismiss for failure to state a claim, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). Second, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570); *see also Tamayo*, 526 F.3d at 1082.

The Court has explained that the "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678–79; *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Determining whether a complaint states a plausible claim for relief requires the court to draw on its judicial experience and common sense. *Iqbal*, 556 U.S. at 679.

## II.  Tortious Interference with Contract

To plead a claim for intentional interference with contract, Cap Stone must allege that (1) an actual or prospective contract existed between Cap Stone and Yale; (2) Quarra interfered with that contract or prospective contract; (3) the interference was intentional; (4) the interference caused Cap Stone to sustain damages; and (5) Quarra was not justified or privileged to interfere.  Wis. JI-CIVIL 2780 (2007); *Briesemeister v. Lehner*, 2006 WI App 140, ¶48, 295 Wis. 2d 429, 452, 720 N.W.2d 531, 542.  As becomes clear when the counterclaim is supplemented by Cap Stone's opposition brief, Cap Stone is claiming that Quarra interfered with an existing contract, not a prospective one.

Quarra concedes that Cap Stone has sufficiently pleaded four of the five elements.  It argues, however, that the counterclaim fails on the second element, interference with a contract. Quarra relies on the Wisconsin Supreme Court's decision in *Sampson Invs. v. Jondex Corp.*, 176 Wis. 2d 55, 499 N.W.2d 177 (1993), in which the court held that

> even where there has been no breach of a contract, a plaintiff seeking to maintain a claim for tortious interference with contract must show some specific right which has been interfered with.

> 176 Wis. 2d at 73.

Quarra argues that Cap Stone's counterclaim must be dismissed because Cap Stone has not adequately identified any specific right in Cap Stone's contract with Yale with which Quarra has interfered.

In response, Cap Stone does not allege that Quarra has caused Yale to breach its contract with Cap Stone; Cap Stone doe not identify any specific contractual right with which Quarra allegedly interfered; Cap Stone does not attempt to show how its counterclaim meets the

6

standard set out in *Sampson*.  Instead, Cap Stone argues that, to the extent that *Sampson* might appear to delimit the  circumstances in which a claim of tortious interference can proceed in the absence of an actual breach, any such suggestion is nonbinding *dicta*.  Cap Stone points out that in a pre-*Sampson* case, the Wisconsin Supreme Court had observed that "any conduct which is intended to and which, in fact, makes performance [by the promisor] more onerous is, unless privileged, a tort against the promisor." *Wisconsin Power & Light Co. v. Gerke*, 20 Wis. 2d 181, 187, 121 N.W. 2d 912, 915-16 (1963) (quoting 1 Torts, Harper and James, p. 499, sec. 6.9).  Cap Stone also notes that in *Briesemeister,* 2006 WI App 140 at ¶48, the Wisconsin Court of Appeals did not identify the "specific right" requirement as an element of a tortious interference claim.  Cap Stone's argument is precluded by a careful reading of *Sampson* and *Gerke.*

In *Sampson*, the defendant, Jondex, operated a supermarket in space leased in Sampson's shopping center.  The lease required Jondex to operate a "retail warehouse store" (*e.g.*, a supermarket) in the leased space (to serve as the center's anchor tenant) but the lease did not contain a continuous operation clause.  During the term of this lease, a rival shopping center (Mega Marts) persuaded Jondex to move its supermarket into Mega Marts' shopping center two blocks away.  Jondex left Sampson's shopping mall but continued to pay rent on the now empty space.

Sampson sued Jondex for breach of contract, arguing that the lease required Jondex to keep its supermarket operating, not just pay the rent.  *Id*. at 60, 499 N.W.2d 177.  Sampson also sued Mega Marts for tortious interference with Jondex's contract with Sampson.  The Wisconsin Supreme Court rejected Sampson's breach of contract claim against Jondex, finding

that because the lease agreement did not contain a continuous operation clause, Jondex was not in breach if it paid the rent while refraining to use the premises. *Id*. at 62-71, 499 N.W. 2d 177.

The next question was whether, in the absence of a breach of contract, Sampson could maintain a claim against Mega Marts for tortious interference. The court answered this question in the negative. It began by citing Section 766 of the Second Restatement of Torts (1979), which provides that:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Id*. at 71, 499 N.W. 2d 177. Sampson's claim against Mega Marts failed under this test, explained the court, because even if Mega Marts had induced Jondex to vacate the premises, "this conduct does not constitute interference with performance because Mega Marts simply induced Jondex to perform the contract in one of the two ways allowed under the contract." *Id*. at 72.

The court then considered whether Sampson could proceed under its theory that it had been deprived of the "value of the bargain" that he had struck with Jondex. *Id*. at 72. Sampson claimed that the value of its bargain was to have a fully-leased, operating shopping center where all tenants would benefit and profit from "high shopper traffic." *Id*. Just as Cap Stone argues in the instant case, Sampson argued that the validity of its theory had previously been accepted by the Wisconsin Supreme Court in *Gerke*, 20 Wis.2d 181, 121 N.W.2d 912. In that case, a highway construction contractor claimed that the electric power company's refusal to remove its power line had interfered with his ability to perform a construction contract into which he

8

had entered with the state.  *Gerke*, 20 Wis. 2d at 187, 121 N.W. 2d at 915.  Quoting from 1

Torts, Harper and James, p. 499, sec. 6.9, the court in *Gerke* (in an opinion written by Justice

Fairchild) recognized that Gerke's value-of-the-bargain theory was not novel:

> It has been recognized that 'the value of a bargain may be impaired
> although there is no failure of performance. In such a case, it may
> be the promisor rather  that the promisee who sustains the loss.
> Thus, any conduct which is intended to and which, in fact, makes
> performance more onerous is, unless privileged, a tort against the
> promisor * * *'.

*Id*., 20 Wis. 2d at 187, 121 N.W.2d at 915-16.  Although it found "no difficulty with the

concept of the cause of action Mr. Gerke asserts he has," the court went on to find the claim to

be without merit under the facts of the case.  *Id*., 20 Wis. 2d at 187, 121 N.W. 2d at 916.

The court in *Sampson* agreed with its plaintiff that the court in *Gerke* had recognized that

the value of a bargain may be impaired even without a failure of performance.  *Sampson*, 176

Wis. 2d at 72.  Nonetheless, the value of Sampson's bargain had not been impaired because,

under the terms of the lease agreement, Jondex was permitted to refrain from using the premises

as long as it continued to pay rent.  To the extent Sampson expected otherwise, said the court,

that expectation was not reasonable.  *Id*.  The court explained:

> To hold otherwise would allow Sampson to circumvent the
> limitations of the lease agreement and expand their rights through
> a tort claim. Prosser & Keeton on Torts explains that "tort liability
> may be imposed upon a defendant who intentionally and
> improperly **interferes with the plaintiff's rights under contract**
> with another person if the interference **causes the plaintiff to
> lose a right under the contract or makes the contract rights
> more costly or less valuable.**"  W. Page Keeton, Dan B. Dobbs,
> Robert E. Keeton, David G. Owen, *Prosser and Keeton on Torts*, sec.
> 129 (5th ed. 1984) (emphasis added).  Even where there has been
> no breach of a contract, a plaintiff seeking to maintain a claim for
> tortious interference with contract must show some specific right
> which has been interfered with.  In the present case, however,

9

> Sampson had no right to require Jondex to continuously operate a retail warehouse food store. Thus, even though Jondex refrained from using the premises, this action did not interfere with any of Sampson's rights. In fact, allowing Sampson's claim would grant them rights which the parties **did not** bargain for. The inability to show any right which was interfered with is fatal to Sampson's tortious interference claim.

Id. at 72-73, 499 N.W.2d at 184, bolding in the original.

As should be plain from this passage, the court's conclusion that "a plaintiff seeking to maintain a claim for tortious interference with contract must show some specific right which has been interfered with" is the court's holding. It is not *dicta*. Then-Justice Abrahamson recognized as much in her dissent. *Id*. at 74, 499 N.W. 2d at 185 ("The majority apparently concludes that an action for tortious interference with the performance of a contract is available only when there has been interference with a specific right bargained for under the contract.").

In light of the majority's head-on consideration of *Gerke*, its announcement that the threshold for a tort claim was "interference with a specific right" can only be viewed as a narrowing of the circumstances in which a diminished-value-of-the-bargain theory would be actionable in Wisconsin. Finally, as for Cap Stone's reliance on *Briesemeister*, that case is a court of appeals' decision in which the tortious interference claim failed on other grounds. 295 Wis. 2d 429, ¶54. The court's failure to discuss *Sampson* is meaningless.

In sum, I agree with Quarra that under *Sampson*, Cap Stone must allege that Quarra interfered with a specific right under Cap Stone's contract with Yale in order to state an actionable claim for tortious interference. There being no suggestion by Cap Stone that it has or could allege such facts, Quarra's motion to dismiss this counterclaim will be granted.

### III.  Abuse of Process

Abuse of process is a tort that occurs when someone "uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed . . . " *Schmit v. Klumpyan*, 2003 WI App 107, ¶6, 264 Wis.2d 414, 663 N.W.2d 331 (citing  2 Dan B. Dobbs, The Law of Torts § 438 (2001)).   In Wisconsin, a plaintiff must prove two elements to establish an abuse of process:  1) the defendant had a purpose other than that which the process was designed to accomplish, *i.e.,* an ulterior motive; and 2) the defendant subsequently misused the process to accomplish a purpose other than that which it was designed to accomplish.  Wis JI-Civil 2620. *See also Brownsell v. Klawitter*, 102 Wis. 2d 108, 116, 306 N.W. 2d 41, 45 (1981) (citing *Thompson v. Beecham*, 72 Wis.2d 356, 362, 241 N.W.2d 163 (1976)).  With respect to the "misuse" element, the Wisconsin Supreme Court has explained that it requires

> [s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process . . . there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.

*Thompson*, 72 Wis. 2d at 362-63, 241 N.W.2d at  166 (1976) (quoting Prosser, *Law of Torts* (4th ed. 1971), sec. 121, pp. 857, 858).  Because of its potential chilling effect on the right of access to the courts, the tort of abuse of process is disfavored and must be narrowly construed. *Wisconsin Public Service Corp. v. Andrews*, 2009 WI App 30, ¶ 19, 316 Wis.2d 734 766 N.W.2d 232 (quoting *Schmit*, 2003 WI App 107, ¶¶ 8-9, 264 Wis. 2d 414, 663 N.W.2d 331).

The Restatement notes that "the usual case of abuse of process is one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt

or take some other action or refrain from it." Restatement (Second) of Torts § 682 cmt. b (1977). The Court of Appeals for the Seventh Circuit has proffered the example of suing one's daughter's fiancé to force him to end the engagement, s*ee Professional Service Network, Inc. v. American Alliance Holding Co.*, 238 F.3d 897, 902 (7th Cir. 2001); or "the initiation of a civil proceeding to coerce the payment of a claim completely unrelated to the cause of action sued upon." *Sweeney v. Flanagan*, 1996 WL 414170, at *1 (7th Cir. July 23, 1996) (citation omitted) (unpublished disposition). Examples of Wisconsin cases in which an abuse of process claim was found to lie include a husband's alleged use of a bench warrant for his wife in order to coerce her into granting him visitation with their children, *Strid v. Converse*, 111 Wis. 2d 418, 426, 331 N.W. 2d 350 (1983), and university officials obtaining of an emergency mental health commitment order against a student when they had no actual concern about her mental condition but instead simply wished to block her physical departure from the school. *Maniaci*, 50 Wis. 2d at 301, 184 N.W. 168. The Wisconsin Supreme Court also has noted with approval Prosser's example of a defendant having the plaintiff arrested in order to compel him through duress to surrender the register of a vessel, without which the plaintiff could not go to sea. *Brownsell*, 102 Wis.2d at 113, 306 N.W.2d 41 (citing Prosser, Handbook of the Law of Torts § 121, at 856 (4th ed. 1971)).

When viewed against this legal backdrop, Cap Stone's allegations, even when taken as true and construed most favorably to Cap Stone, fail to state a claim for abuse of process. Cap Stone does not allege that Quarra sought any material, collateral advantage from bringing its breach of contract action, such as forcing Cap Stone to pay a different debt. Although Cap Stone contends that Quarra filed the action to put financial pressure on Cap Stone to negotiate,

this is a legitimate objective–or at least, not an illegitimate objective–of a lawsuit. *Accord Janky v. Batistatos*, 2008 WL 4411504, *7 (N.D. Ind. Sept. 25, 2008) ("Whether Defendants' pleadings put pressure on her during settlement negotiations or harmed Janky's reputation has no bearing on whether process was abused, since the same could be said of the most truthful and well-meaning defense.").

Insofar as Cap Stone contends that Quarra has filed its suit with malicious intent, the fact that Quarra may have been motivated by revenge or spite will not support an abuse of process claim. *Schmit*, 2003 WI App 107, ¶11, 264 Wis.2d 414, 663 N.W.2d 331 ("[T]here is no action for abuse of process when the process is used for the purpose for which it *is intended*, but there is an incidental motive of spite.") (quoting Restatement (Second) of Torts § 682 cmt.b) (1977) (emphasis added by court). *See also* W. Page Keeton et al., Prosser and Keeton on the Law of Torts  § 121, at 897 (5th ed. 1984) ("Abuse of process differs from malicious prosecution in that the gist of the tort is not commencing an action or causing process to issue without justification, but misusing, or misapplying process justified in itself for an end other than that which it was designed to accomplish.").

There being no allegation by Cap Stone that Quarra perverted the court's process to accomplish some result that the process was not intended by law to accomplish, Cap Stone's abuse of process claim must be dismissed.

**ORDER**

IT IS ORDERED that plaintiff Quarra's motion to dismiss counts IV and VI of defendant Cap Stone's amended counterclaim, dkt. 73, is GRANTED.

Entered this 8th day of July, 2014.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge